**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LOWELL RAUCH and CAROL ANNE RAUCH, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LINCOLN NATIONAL CORP. and LINCOLN NATIONAL LIFE INSURANCE COMPANY, <br> Defendants. | No. <br><br> **COMPLAINT – CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Lowell Rauch and Carol Anne Rauch ("Plaintiffs"), by their undersigned attorneys, bring this action ("Action") as a class action individually and on behalf of a nationwide class of all other persons and entities similarly situated, and a sub-class of North Carolina residents (the "Classes") against Defendants Lincoln National Life Insurance Company ("LNIC") and its parent company, Lincoln National Corp. ("LNC") (collectively, "Lincoln" or "Defendants"). Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.

**SUMMARY OF THE ACTION**

1.      This cases arises out of improper Cost of Insurance ("COI") rate increases imposed on certain universal life insurance policies issued by Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot") from approximately 1999 through 2007.  Lincoln acquired Jefferson-Pilot in 2006 and assumed all of the responsibilities and contractual obligations thereunder.

2.      The affected policies were Jefferson-Pilot's "Legend Series" Flexible Premium Adjustable Life Insurance Policies, known more specifically as JPF Legend 300, JPF Legend 400,

1

LifeWriter Legend 300, LifeWriter Legend 200 and LifeWriter Legend 100 (collectively, "Policies"). Plaintiffs and the Classes purchased, owned, or were the beneficiaries of the Policies.

3.      The Policies are adjustable life insurance policies, a type of universal life insurance product, which combine aspects of term life insurance (life insurance policies that pay a benefit if the insured dies during a specified term) with a separate interest-bearing account into which premium payments are made. Through its features, adjustable life insurance allows policyholders the flexibility of adjusting the period of protection, increasing or decreasing the face amount, raising or lowering the premium amount, and changing the length of the premium payment period. Pursuant to these features, policyholders are able to pay a minimum premium to keep the policy in force – *i.e.*, the amount sufficient to cover the COI and other administrative expenses.

4.      COI charges are ordinary the largest charge assessed to an adjustable life insurance policyholder. For the Policies, COI charges are assessed by a formula whereby Lincoln multiplies the net amount at risk ("NAR") – which is the face amount of insurance in force minus the account values – by a Lincoln established COI Rate.

5.      The Policies contain an express contractual provision that states "The monthly cost of insurance rates are determined by us. Rates will be based on our expectation of future mortality, interest, expenses, and lapses." This provision does not permit Defendants to increase COI rates for reasons other than those stated forward looking factors. For example Lincoln cannot increase the COI rate to cover for improper dividends paid by LNIC to its parent company LNC, past losses on the particular book of business, or miscalculations concerning past mortality assumptions, interest rates, expenses or lapse rates. Likewise, Lincoln is not permitted, pursuant to the policy terms, to increase COI charges to earn future profits above the level at the time the Policies were priced.

6.     The COI charge, including the COI rate, reflects the insurer's risk that it will have to pay the policy's face amount to the beneficiaries in the event the insured dies.  Necessarily, the COI charge increases as the insured ages, reflecting the increased risk of mortality as a policyholder ages.

7.     When a policyholder contributes amounts in excess of the COI and policy administration fees, those contributions are *supposed* to accumulate inside the policy and comprise the cash value of the policy.  In the case of the Policies, "[t]he minimum rate of interest guaranteed is 4.00%."

8.     Lincoln's policyholders have spent thousands, tens of thousands, or even hundreds of thousands of dollars in premium to take advantage of the 4% guaranteed interest rate to increase the cash value of their Policies.

9.     Recently, in or about September 2016, despite years of admittedly *decreasing* mortality rates, and with that improved mortality trend projected to continue in the future, Lincoln in breach of its contract began to substantially *increase* its COI rates, which in turn increased the amount of premium on the Policies that would be required to keep the policy in force for the originally anticipated duration and at the same death benefit level.

10.    In a letter to Policyholders explaining the increase, Lincoln explained it was "operating in a challenging and changing environment as we continue to face nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."  As a result, it needed to make "fair and reasonable adjustments as necessary and appropriate to ensure [Lincoln] … provide[s] value to [its] customers…."

11.    Likewise, in response to Plaintiffs' complaint to the North Carolina Department of Insurance a representative of Lincoln stated that the reason was because "[t]he expected cost of

providing insurance coverage has risen, due to a variety of factors including lower investment income and higher expenses. COI has been adjusted to appropriately reflect changes in these factors[.]"

12.     In reality, the rate increases were imposed to improperly shift to the policyholders Lincoln's own obligation to pay interest at the guaranteed minimum rate of 4% and to recoup past losses and spread deficiencies or reduced profits on the Policies, and therefore constituted a breach of Lincoln's contractual obligations under the Policies.  The COI rate increases and resulting premium increases were also designed to force or induce widespread Policy terminations by Policyholders who could no longer afford, or would have no rational reason to pay, the substantial premium increases, or otherwise compel a full surrender of the Policy to obtain its cash value, thus enabling Lincoln to avoid paying the death benefit, or cause a partial surrender of the Policy by agreeing to a lower death benefit.

13.     Plaintiffs' and the Classes' Policies began to lose (or accelerated the loss of) value as the increased COI charge exceeded the amount of the interest rate on excess contributions and the premiums paid by the policyholders.

14.     Moreover, despite Lincoln's newly avowed concerns about changed future expectations of "mortality, interest, expenses, and lapses," over the past several years, LNIC annually has paid hundreds of millions of dollars to LNC in dividends.  Indeed, between 2013 and 2015, LNIC paid nearly $2.47 billion in dividends to LNC.  And for the nine months ended September 30, 2016, when LNIC announced the COI rate increase, it had already paid $750 million in dividends to LNC.

15.     As the owner of a Policy as defined herein, Plaintiffs bring this Action on behalf of themselves and the proposed Classes, seeking damages and equitable relief to end and remedy

4

Lincoln's unlawful and improper COI rate increase and associated effects on the value of their Policies. Lincoln's improper COI rate increase seeks to deprive these policyholders of the benefit of their bargain and permit Lincoln to profit from its own error.

## PARTIES

16.    Plaintiffs are residents and citizens of the state of North Carolina and the owners of a Policy, which was issued in North Carolina on November 12, 2002, with a face amount of $800,000. Plaintiffs received a letter dated September 6, 2016 stating that the COI rate was increasing, which would cause a commensurate increase in the premiums required to maintain the same level of coverage and keep the policy in force for the same duration as prior to the increase.

17.    On September 23, 2016, Plaintiffs received another letter attaching an updated illustration showing the projected performance of his policy under non-guaranteed and guaranteed assumptions. The illustration demonstrates that the COI increases will have a devastating impact on his Policy, rendering it all but worthless in a very short time without a significant additional cash outlay for the remainder of the in-force time period.

18.    As demonstrated by documents that Lincoln has sent to the North Carolina Insurance Department the charge for Plaintiffs' cost of insurance rose by nearly 85% between October and November 2016.

19.    In response to the exorbitant increase in the COI charge and corresponding illustration, Plaintiffs requested a decrease of the death benefit from $800,000 to $600,000 effective January 12, 2017. The change caused the policy to incur a pro rata surrender charge of $4.00.

20.    Defendant LNC is an Indiana corporation with its principal place of business at 150 North Radnor-Chester Road, Radnor, PA. LNC is the parent of Defendant LNIC. Lincoln

Financial Group is the marketing name for LNC and its affiliates.

21.    Defendant LNIC is a life insurance company organized and existing under the laws of the state of Indiana, with its principal place of business in Fort Wayne, Indiana.  LNIC is a wholly-owned subsidiary of LNC.  LNIC's principal individual life insurance operations are located in Greensboro, NC.

22.    On April 3, 2006, LNC completed the merger of Jefferson-Pilot Corporation, a North Carolina-based financial services holding company, into one of its wholly owned subsidiaries.  In 2007, LNC directed that Jefferson-Pilot, a subsidiary insurer of Jefferson-Pilot Corporation, be merged into Lincoln.  As a result of the merger of LNC and Jefferson-Pilot in 2006, all of Jefferson Pilots' insurance Policies that are the subject of this lawsuit were absorbed, owned and controlled by the combined company, LNC, which sold and operated its universal life insurance products through its subsidiary LNIC and LNC's marketing arm doing business as Lincoln Financial Group.

## JURISDICTION AND VENUE

23.    This Court has personal jurisdiction over the parties to this action because Defendants transact business in this District and have been doing so for decades.  LNC maintains its principal place of business in this District.  Moreover, thousands of members of the proposed nationwide Class are resident citizens of the Commonwealth of Pennsylvania, many of which are all but certain to reside in this District.  Jurisdiction over Defendants is also proper because they have availed themselves of the privilege of conducting business activities in Pennsylvania and in this District and because they currently maintain systematic and continuous business contacts in the Commonwealth of Pennsylvania and this District.

24.     This Court has jurisdiction over the subject matter of this Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)(A), because (1) the putative class consists of at least hundreds of proposed members; (2) the citizenship of at least one class member (*e.g.*, Plaintiffs) is different from all Defendants; and (3) the aggregate amount placed in controversy by the claims of Plaintiffs and the putative class members exceeds the sum of $5,000,000 exclusive of interest and costs.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (1) LNC maintains its principal operations and corporate headquarters in this District; (2) a substantial proportion of the members of the proposed nationwide Class reside in this District and their policies at issue were issued to them in this District.  Thus a substantial part of the events or omissions giving rise to the claims at issue occurred in this District.

**BACKGROUND FACTS REGARDING UNIVERSAL LIFE INSURANCE**

26.     Life insurance typically provides money to beneficiaries after a loved-one who has life insurance dies.  The coverage can help pay funeral expenses and estate taxes, replace the decedent's income with a non-taxable death benefit, or more generally reduce the financial burden on the family of the decedent.

27.     Life insurers typically offer several different forms of policies.  Relevant here are so-called "universal life" insurance policies.

28.     Universal life policies combine aspects of term life insurance (life insurance policies that pay a benefit in the event of the death of the insured during a specified term) with a separate interest-bearing account into which premium payments are made.  As a result, policyholders are able to adjust allocations of their contributions between the "term life insurance" component of their policy and the savings component of their policy.

29.     In addition, policyholders can adjust both the amount and frequency of their premium payments so long as the policy itself contains sufficient cash value to cover the monthly deductions in connection with the "cost of insurance" (COI) charges, as well as a small administrative fee.

30.     The way this works is as follows.  Value built up in the policyholders' interest-bearing account generates interest at a minimum guaranteed rate (or, potentially a higher non-guaranteed rate).  Absent other contributions, the interest generated is reduced by the amount of the COI charge and a charge for administrative expenses associated with the policy.  If the COI and administrative charge exceed the interest generated for the month (plus any amounts paid into the policy account), the policy value (and interest generating "principal") is reduced via a "Monthly Deduction."

31.     As Jefferson-Pilot explained in some of its marketing materials "Universal Life Insurance is a kind of flexible policy that lets you vary your premium payments. You can also adjust the face amount of your coverage.…  The premiums you pay (less expense charges) go into a policy account that earns Interest.  Charges are deducted from the account.  If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower.  If it keeps dropping, eventually your coverage will end.  To prevent that, you may need to start making premium payments, or Increase your premium payments, or lower your death benefits.  Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value."

32.     Thus, the size of a COI charge is highly significant to policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is debited from the cash account portion of the policy such that the COI

charge is forfeited entirely to the insurance company in return for providing the life insurance aspect of the policy.

33.     COI charges are assessed on the NAR which represents the face amount of insurance in force less the account's cash value.  The COI charge is calculated by multiplying the NAR by the COI rate.

34.     The COI charge thus reflects the insurer's risk that it will have to pay the policy's face amount to the beneficiaries in the event the insured dies.  Necessarily, the COI charge increases as the insured ages, reflecting the increased risk of mortality.  In this way, COI charges account for the mortality risk the insurer carries.

35.     This universal life insurance concept was devised in the 1970s and became very popular in the 1980s, which was an era of double-digit interest rates.  In this environment, universal life insurers who had little business in force that was issued before interest rates rose (which was nearly all of them) could illustrate the future by assuming that then-current interest rates upwards of 10% would last indefinitely.

36.     Inevitably, however, interest rates began a long term decline, as did the non-guaranteed interest rates that insurance companies paid on universal life insurance policies, culminating in the last 8 years of historically low interest rates.

37.     The result of the low interest rate environment has caused insurance companies to reduce interest credits to universal life policyholders to the guaranteed minimum interest rate – in the case of the Policies, the guaranteed minimum interest rate was 4%.

## THE POLICIES AT ISSUE AND COI CHARGES

38.     The Policies are flexible premium, universal life policies originally underwritten by Jefferson-Pilot between 1999 and 2007 and thereafter.  LNC merged the Jefferson-Pilot Life

Insurance Company insurance into Lincoln in or around 2007.

| Product | Issued from | Guaranteed Interest Rate |
|---|---|---|
| **JP Legend 300** | | |
| w/ Lapse Protection Rider | 2000-2005 | 4.00% |
| w/out Lapse Protection Rider | 2000-2005 | 4.00% |
| **JP Lifewriter Legend 100** | 1999-2005 | 4.00% |
| **JP Lifewriter Legend 200** | 1999-2005 | 4.00% |
| **JP Lifewriter Legend 400** | 2001-2007 | 4.00% |

39.     The Policies contain standardized terms and disclosures.  The Policy documents are standardized, form documents setting forth each of the material provisions at issue in this suit in uniform fashion.  The following terms are mere examples of the form contract language.

**Defining "Policy Value":**

On each monthly anniversary day, the policy value will be (1) plus (2) plus (3) plus (4) minus (5) where

(1) Is the policy value as of the preceding monthly anniversary day minus the monthly deduction for the month ending on the monthly anniversary day.

(2) Is one month's interest on (1).

(3) Is all net premiums received since the preceding monthly anniversary day.

(4) Is interest on (3) from the date the premium is received to the end of the policy month.

(5) Is the reduction in policy value caused by any partial surrender since the preceding monthly anniversary day.

**Defining "Monthly Deduction":**

The monthly deduction for a policy month will be computed as (1) plus (2) where

(1) Is the cost of insurance and the cost of additional benefits provided by rider for the policy month.

(2) Is the sum of all administrative charges for the policy and any

actual riders … due for the policy month.

**Defining "Cost of Insurance"**

The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the number of thousands of net amount at risk for the month. The net amount at risk for a month is computed as (1) minus (2) where

(1) Is the death benefit for the month before reduction for any indebtedness, discounted to the beginning of the month at the guaranteed interest rate.

(2) Is the policy value at the beginning of the month.

40.     Importantly, each Policy contract contains a uniform provision setting forth the circumstances under which the COI rate could change:

The monthly cost of insurance rates are determined by us. ***Rates will be based on our expectation of future mortality, interest, expenses, and lapses***.  Any change in the monthly cost of insurance rates used will be on a uniform basis for Insured of the same rate class. Rates will never be larger than the maximum rate shown on page 11. The maximum rates are based on the mortality table shown on page 4.

(emphasis added).

41.     This provision restricts the circumstances under which Lincoln may raise the COI rate and does not permit Lincoln to increase COI rates, for example, to cover for improper dividends LNIC paid to LNC, or miscalculations concerning past mortality assumptions, interest rates, expenses or lapse rates. Likewise, Lincoln is not permitted, pursuant to the policy terms to increase COI charges to earn future profits higher than the level at the time the Policies were priced.

42.     Alternatively, even if the Policies do not expressly bar Lincoln from increasing COI rates to cover past losses or poor portfolio management, the language is at least ambiguous to the point that it should be construed against the drafter (here, the successor-in-interest to the drafter, Lincoln) and consistent with the reasonable expectation of policyholders, like Plaintiffs and the members of the Classes.

43.     A universal life insurance policyholder holding a contract whose current interest rate has been lowered to the guaranteed minimum would reasonably conclude that increases in COI rates to maintain or restore profitability of the company would in effect void the guarantee (or else render the guarantee illusory) absent a demonstration that mortality of the block of policies has deteriorated profoundly, *i.e.*, running at mortality rates higher than the company's actuaries assumed when pricing the policies.

44.     In other words, when the interest rate is already at the guaranteed minimum, a reasonable policyholder would conclude that Lincoln could not raise the COI charge absent a compelling and significant change in mortality expectations, or other expenses, or lapses.  If Lincoln could raise the COI charge to recoup its own losses stemming from the payment of a guaranteed minimum interest rate that was set a rate too high for the prevailing interest rate environment, the "guaranteed minimum interest rate" is, in fact, not guaranteed at all.  Thus, no reasonable reading of the policy contract could permit this interpretation.

45.     Further, a reasonable policyholder would conclude that the Policies' separate provisions governing the guaranteed interest rates to be paid on the account and Lincoln's ability to increase COI rates operate independently.  Thus, Lincoln would not be able to offset or subsidize its obligation to pay the guaranteed interest rate by increasing the COI charge.

46.     Reasonable policyholders would also conclude that the reference to Lincoln's ability to increase COI rates based on changes to Lincoln's expectations as "interest" in the future refers to changes in Lincoln's interest costs, not any adverse experience in connection with Lincoln's rate spreads, variation between assumed and actual profits, or efforts to increase profitability at assumed pricing.  Otherwise, the guaranteed minimum interest rate is meaningless because the net monthly policy value will always be favorable (profitable) to Lincoln.

## COI RATE INCREASES

47.     In August 2016, Lincoln announced significant COI rate increases on the Policies to its brokers (with announcement letters mailed by Lincoln to policyholders in September 2016) stating that Lincoln would be increasing COI rates, resulting in increased Monthly Deductions from Class members' account values. Lincoln effected these increases starting on October 9, 2016.

48.     In explaining the reason the COI rates were changing, Lincoln identified the climate of "persistently low interest rates" and "volatile financial markets" as motivating the change.

49.     These "justifications" are either misleading or not a permissible basis for an increase in COI rates.

50.     In general, the increased COI rates are designed to maintain or restore carrier profitability due to declining portfolio yields on products with current crediting rates at the guaranteed minimum.

51.     Of course, as noted herein, Lincoln has been tremendously profitable, with LNIC paying well over $3.25 billion in dividends to LNC since 2013.  Despite these enormous dividends, Lincoln proposes to saddle policyholders with the effect of its own inability to meet its contractual obligations to Plaintiffs and the Classes.

52.     Indeed, the question for Lincoln is not one of solvency, but rather greed.

## THE PURPOSE OF LINCOLN'S COI INCREASE

53.     Lincoln offers the explanation that its COI increase was due to its "operating in a challenging and changing environment as [Lincoln] continues to face nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."

54.     As a preliminary matter, Lincoln is expressly citing *past* experience for its need to increase COI charges, a purpose expressly prohibited by the Policies.

55.     A review of Lincoln and its affiliate's public findings provide a fuller picture.

56.     First, Lincoln did not experience a change in its mortality expectations or interest expense.  In its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016, LNC informed investors that "[m]ortality was in line with [LNC's] expectations during the third quarter of 2016."  Indeed, for the nine months ending September 30, 2016, LNC reported that fee income from COI charges was up 9% over the first three quarters of 2015, while the "Account Values"[1] and the "In-Force Face Amount"[2] of universal life policies increased by only 2% as compared with the first three quarters of 2015.

57.     Further, Lincoln actively monitors its experience with such factors.  In Lincoln's 2015 Statutory Annual Statement, Lincoln represented that "cost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions" and that "those adjustments are made in a way that past losses (i.e., experience less favorable to the company than expected) are not recouped."

58.     Lincoln further addressed the question of whether anticipated experience factors underlying non-guaranteed elements differ from current experience in its 2015 Statutory Annual Statement.  Lincoln responded "in the determination of policy cost factors for some non-guaranteed products, it is anticipated that expenses will continue to increase in the future with inflation" and "investment yields may continue to decline and result in compression of spreads between earned rates and crediting rates."

59.     Importantly, Lincoln's 2015 Statutory Annual Statement did not express any anticipated change in future expectations in mortality experience, or any credible expectation that

---

[1] "Account value" refers to the cash value of the universal life policy as built up in the "savings component" of the policy.

[2] "In-force face amount" refers to the death benefit payable on the policy.

interest rates would decline further.   In fact, Lincoln's 2015 Annual Statement stated that "mortality experience is also predicted to improve in the future."

60.     Additionally, Lincoln's expectations of future investment returns could not reasonably be materially lower than what Lincoln expected prior to the raise - and certainly not nearly so much lower as would be need to justify a massive increase of this size.  LNC's Q2 2016 reporting supplement shows a 5.22% earned rate on reserves, a tenth of a percent lower than the prior year.

61.     Likewise reinsurance costs are not an enumerated factor for an increase, and even if they were they cannot provide material support for the increase, LNC's recent earnings releases do not mention losses due to increased reinsurance costs at all - in fact, its Q4 2014 results show a $53 million profit on recapturing policies from out of reinsurance contracts.

62.     The true reason for the COI rate increases and increased Monthly Deduction is Lincoln's desire to avoid its contractual obligation to meet the high interest crediting rates it promised under the Policies, and to recoup past losses or past profits lower than the level of profitability assumed at pricing – thereby increasing future profits to levels higher than those projected at pricing.

63.     As a result of the prolonged low interest rate environment, Lincoln's investment returns have been much lower than the rates assumed at pricing.  These low earned interest rates, combined with the Policies' 4% guaranteed rate, caused Lincoln to sustain past losses or past profit levels lower than the priced-for levels during those prior years.  Lincoln seeks to offset or subsidize its credited interest guarantees and recoup its past financial problems through the COI rate increases and increased Monthly Deductions.  What Lincoln is actually doing is attempting to avoid its obligation to credit the guaranteed interest rates under the Policies, to recoup past losses

or past reduced profits and to shed the Policies by making the premiums to maintain them cost-prohibitive for the Policyholders – thereby frustrating the Policyholders' ability to receive their contractual benefits under the Policies.

64.     Moreover, when Jefferson-Pilot priced and sold the Policies, it established a Monthly Deduction schedule that was designed to generate high profits in early durations followed by potential losses in later durations.  Now, Lincoln, the successor to Jefferson-Pilot, wants to reverse that decision, and seeks to impose unfair and excessive COI rate increases to recoup the reduced profits and losses resulting from the rate schedule the company it acquired affirmatively enacted.

65.     However, non-guaranteed elements such as the COI rate and Monthly Deduction are required to reflect expectations of future, not past experience.  Accordingly, Lincoln is precluded from re-determining those elements to recoup past losses or past constrained profits.  To do so would violate the actuarial standards of practice and code of professional ethics.

66.     Strikingly, Lincoln's unconscionable business practices have the most impact on elderly Policyholders, many of whom have paid premiums for two decades based on the expectation that the Policies would provide protection for their families.  Due to age-related underwriting considerations, life insurance protection for these elderly policyholders and Plaintiffs are now either unavailable or prohibitively expensive; thus Defendants' actions have essentially stripped Plaintiffs and the members of the Classes of future life insurance protection.

67.     Lincoln's attempt to deprive Plaintiffs and the Class members of the primary benefit of their Policies – paid for through years of contributions to their Policy values – violates Lincoln's express and implied obligations under the Policies, amounts to "unlawful" and "unfair" conduct.

68.     Plaintiffs therefore respectfully seek immediate necessary and appropriate legal and equitable relief to halt and reverse the COI rate increases and consequent Monthly Deduction increases.  Unless Lincoln is enjoined, the Policyholders will be irreparably damaged and Lincoln will succeed with its plan to cause mass cancellations of the Policies – leaving tens of thousands of Policyholders without coverage based on an unlawful, unfair and abusive COI Rate increases.

69.     By this Action, Plaintiffs seek damages, declaratory relief and injunctive relief requiring Lincoln to (i) reverse the unlawful increase in Monthly Deductions charged on the Policies, and (ii) reinstate all Policies that were surrendered or lapsed as a result of the COI rate increase and related Monthly Deduction and resulting premium increases.

## CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this action on behalf of himself and all others similarly situated as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

71.     Plaintiffs propose one Class and one Sub-Class (collectively "the Classes"), defined as:

> All persons in the United States who, beginning September 1, 2016, were subjected to a COI rate increase under a universal life policy issued by Jefferson-Pilot that has resulted or will result in a higher Monthly Deduction charge than that which was applicable under the rate schedule in effect prior to that date. ("Nationwide Class" or "Class")

> All North Carolina residents who, beginning September 1, 2016, were subjected to a COI rate increase under a universal life policy issued by Jefferson-Pilot that has resulted or will result in a higher Monthly Deduction charge than that which was applicable under the rate schedule in effect prior to that date. ("North Carolina Sub-Class" or "Sub-Class")

72.     **Class Identity:**  The members of the Class and Sub-Class are readily identifiable and locatable through Lincoln's own records.

73.     **Numerosity:**  The proposed Class and Sub-Class are so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court.  The exact number of Class and Sub-Class members is unknown to Plaintiffs at this time, but can be ascertained through appropriate discovery, since members of the proposed Class and Sub-Class will be identified from records maintained by Lincoln.  The Class and Sub-Class are each believed to have thousands of members.

74.     **Typicality:**  Plaintiffs' claims are typical of those of the Class members and Sub-Class members, and the relief sought is typical of the relief which would be sought by each Class member and Sub-Class member in separate actions.  Plaintiffs' claims are based on the same legal theory as the claims of the other Class members and Sub-Class members and are based on the same breaches of contracts and obligations, misleading representations, misrepresentations, and omissions performed and made by Lincoln.  Plaintiffs and Class and Sub-Class members are similarly aggrieved as a result of Lincoln's conduct as described herein.

75.     **Adequacy:**  Plaintiffs will fairly and adequately protect the interests of the Class and Sub-Class members.  Plaintiffs and the other Class and Sub-Class members were injured by Lincoln's same conduct, and Plaintiffs have no interests that are antagonistic or adverse to the interests of Class or Sub-Class members.  Plaintiffs have retained counsel competent and experienced in insurance law and class action litigation and who have been appointed by numerous courts to lead class actions and complex litigation.

76.     **Rule 23(b)(2) factors**. This action is appropriate under Fed. R. Civ. P. 23(b)(2). Plaintiffs seek injunctive relief and corresponding declaratory relief for the Class and Sub-Class. Lincoln has acted in a manner generally applicable to each member of the entire Class and Sub-Class by imposing these COI rate increases on Policies owned by Class and Sub-Class members.

77.     Lincoln's conduct, if not enjoined, will subject Plaintiffs and the members of the Class and Sub-Class to enormous continuing future harm and will cause irreparable injury to such policyholders.  Absent such relief, Plaintiffs and the members of the Class and Sub-Class will be forced to surrender valuable life insurance policies and/or a substantial amount of the value associated with such policies with no economically viable alternative for life insurance.  The adverse financial impact of Lincoln's conduct is continuing and, unless permanently enjoined, will continue to inflict irreparable injury on Plaintiffs and the members of the Class and Sub-Class.

78.     **Rule 23(b)(3) factors**. Certification pursuant to Fed. R. Civ. P. 23(b)(3) is likewise appropriate.

79.     **Commonality:**  Common questions of law and fact exist as to all Class and Sub-Class members and predominate over any possible questions that might affect only individual Class or Sub-Class members.  Among the questions of law and fact common to the proposed Class and Sub-Class are:

a)      Whether the Policies' contractual terms permit the increased COI rates Lincoln is imposing;

b)      The purpose of and/or motivation behind Lincoln's increased COI rates on the Policies;

c)      Whether Plaintiffs and members of the Class and Sub-Class have been injured by Lincoln's conduct and the appropriate measure of damages; and

d)      Whether Plaintiffs and members of the Class and Sub-Class are entitled to preliminary and permanent injunctive relief or other equitable relief.

80.     **Superiority:**  A class action is superior to any other possible method for the fair and efficient adjudication of the controversy for several reasons:

a)      Class action treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions would engender.

b)   Class members have little interest in individually controlling the prosecution of separate actions. The substantial fees and costs required to challenge Lincoln's wrongful conduct greatly exceed the penalty available to any individual Class member and it would not be feasible or desirable for individual Class members to prosecute separate actions against Lincoln.

c)   There are no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action. On the contrary, the expense and burden of litigation would make it difficult or impossible for individual Class members to maintain individual actions. Moreover, even if such individual litigation were practicable, the cost to the court system of adjudication of individual litigation would be substantial. This action will result in an orderly and expeditious administration of Class claims. Economies of time, efforts, and expense will be fostered, and uniformity of decisions will be ensured.  In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

## CAUSES OF ACTION

### COUNT I:  BREACH OF CONTRACT
### (on behalf of the Nationwide Class and North Carolina Sub-Class)

81.    Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

82.    Lincoln is the successor-in-interest to Jefferson-Pilot Life Insurance Company and is a party to Plaintiffs' Policy and the Policies of the members of the Class and Sub-Class.

83.    The Policies are valid, enforceable contracts between the policyholder owners (*i.e.*, Plaintiffs and the members of the Classes) and Defendants.  Under the Policies, Plaintiffs and the members of the Classes are entitled to exercise every right and option and receive every benefit provided by the Policies.  Thus, owners of the Policies may seek recovery for Defendants' breaches of the Policies.

84.    Plaintiffs and the members of Classes have paid premiums (or premiums were paid on their behalf) to Lincoln and its predecessor Jefferson-Pilot through Monthly Deductions, including a cost of insurance charge under the Policies as established at the inception of the

Policies, or otherwise made contributions to the Policies' value and have otherwise performed all their obligations under the Policies.

85.     As alleged above, Defendants owe duties and obligations to Plaintiffs and the members of the Classes under the Policies, including, but not limited to, refraining from imposing premium and COI charges except as permitted under the terms of the Policies.

86.     Defendants have materially breached the terms and provisions of the Policies by increasing the COI rate and the consequent Monthly Deduction commencing since approximately October 2016, with resulting significant premium increases, for reasons not permitted by the language contained in the Policies.

87.     Instead, Defendants have enacted those increases in order to reduce interest credited to Plaintiffs and the members of the Classes and to recoup past losses, dramatically depleting policy values and forcing mass lapses and surrenders of the Policies.

88.     At a minimum, the premium and COI rate increases are of such a scale that, even if legitimate cost of insurance increases were a factor, Lincoln necessarily considered impermissible factors other than the cost of insurance in setting the level of the premium and COI rate increase.

89.     Lincoln's conduct and material breaches of the Policies have proximately caused damages to Plaintiffs and the members of the Classes in an amount to be determined at trial.

90.     In addition, unless Defendants are preliminarily and permanently enjoined from continuing to impose COI charges in the form of extraordinary and higher premiums and deduct the unlawfully increased Monthly Deduction charges, Plaintiffs and the members of the Classes will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## COUNT II:  BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
### (on behalf of the Nationwide Class and North Carolina Sub-Class)

91.     Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

92.     Lincoln is the successor-in-interest to Jefferson-Pilot Life Insurance Company and is a party to Plaintiffs' Policy and the Policies of the members of the Class and Sub-Class.

93.     The Policies are valid, enforceable contracts between Lincoln, as successor-in-interest to Jefferson-Pilot and Plaintiffs or the members of the Classes.

94.     Contractual covenants of good faith and fair dealing through which Lincoln owes Plaintiffs and the members of the Classes a duty to act in a manner that did not frustrate their reasonable expectations under the Policies are implied in the Policies.

95.     Defendants contractually breached the covenant of good faith and fair dealing because, to the extent Lincoln had the discretion to increase the COI rate and Monthly Deduction, that discretion was sufficiently constrained under the terms of Policies to support an implied obligation of good faith and fair dealing with respect to the cost of insurance charges and associated extraordinarily higher premiums.

96.     Defendants' contractual breach of the covenant of good faith and fair dealing has proximately caused damages to Plaintiffs and the members of the Classes in an amount to be determined at the time of trial.

97.     In addition, unless Defendants are preliminarily and permanently enjoined from continuing to deduct the unlawfully increased Monthly Deduction charges, Plaintiffs and the members of the Classes will suffer severe and irreparable injuries for which they have no adequate remedy at law.

**COUNT III: VIOLATIONS OF THE NORTH CAROLINA DECEPTIVE AND UNFAIR**
**TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1, ET SEQ.**
**(On behalf of the North Carolina Sub-Class)**

98.     Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

99.     The North Carolina Deceptive and Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1, makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

100.     Lincoln engaged in deceptive practices by surreptitiously raising the COI rate for the Policies and representing that these rate increases were in fact justified, when in reality Lincoln knew that its rate increase was not justified by future mortality rates (or any other proper justification for rate increases).

101.     Lincoln's conduct was in commerce and affected commerce.

102.     As a direct and proximate result of these deceptive commercial practices, the Plaintiffs and the North Carolina Sub-Class have been damaged by having to pay higher COI rates and thereby also depleting cash account values and are entitled to recover actual and treble damages as well as attorneys' fees and costs and all other relief allowed under N.C. Gen. Stat. §§ 75-16 and 75-16.1.

**COUNT IV: CONVERSION**
**(on behalf of the Nationwide Class and North Carolina Sub-Class**

103.     Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein

104.     Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class have a property interest in the cash value of their Policies.

105.     Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class likewise have ownership of their Policies.

106.     Defendants had access to the cash account portion of Plaintiffs' and the members of the Nationwide Class and North Carolina Sub-Class's Policies.

107.     Defendants' access to the cash account portion of the Policies included the ability to debit the Policies' value based on the COI charges.

108.     Defendants had and continue to have a duty to maintain and preserve their customers' Policies and the cash account values of those Policies.

109.     Defendants wrongfully and intentionally used their access to the cash account portion of Plaintiffs' and the members of the Nationwide Class and North Carolina Sub-Class's Policies to debit improperly inflated COI charges from Plaintiffs' and the members of the Nationwide Class and North Carolina Sub-Class's Policies' cash account values.  Defendants took these funds for their own uses including, without limitation, to pay dividends and otherwise maintain their profitability on the Policies.

110.     In doing so, Defendants wrongfully and intentionally took specific and readily identifiable funds from their customers' Policies' cash accounts and debited the cash account balances of those Policies.

111.     Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class did not authorize or consent to such debits against their Policies' cash account values. Defendants retain these funds unlawfully.

112.     As a result of these unauthorized debits, Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class have been deprived of the ownership and use of their cash account values.

113.     Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class cannot use the converted portion of their cash account value to use a collateral for a loan, cannot use it in calculating the cash surrender value of the policy, and cannot use it to pay proper cost of insurance charges to keep the policy in force.

114.     Thus, Defendants have assumed and exercised the right of ownership over these funds without authorization to do so and in hostility to the rights of Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class without legal justification.

115.     Defendants intend to permanently deprive Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class from exercising control over these funds.

116.     Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class properly own these funds, not Defendants who now claim that they are entitled to their ownership contrary to the rights of Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class.

117.     Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class are entitled to the immediate possession of these funds.

118.     Defendants have wrongfully converted these specific and readily identifiable funds.

119.     Defendants' wrongful conduct is of a continuing nature.

120.     As a direct and proximate result of Defendants' wrongful conversion, Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class have suffered and continue to suffer actual damages. Plaintiffs and the members of the Nationwide Class and North Carolina Sub-Class are entitled to recover from Defendants all damages and costs permitted by law, including all amounts Defendants have wrongfully converted, which are specific and readily identifiable.

## COUNT V:  INJUNCTIVE AND RESTITUTIONARY RELIEF
### (on behalf of the Nationwide Class and North Carolina Sub-Class)

121.    Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

122.    Defendants engaged in the following practices, among others:

   a.    Imposing the COI increase even though Defendants' expected future mortality exposure has improved and is better than the mortality upon which the original COI rate schedule is based -- in order to increase premiums, recoup past losses, or force policyholders to surrender their policies, all of which is designed to enhance Defendants' profit margin contrary to, and precluded by, the express terms of the policies.

   b.    After the sale of the policies, sending annual reports, policy servicing statements, illustrations and other documents and correspondence to Plaintiffs and the members of the Classes without disclosing that there would be sudden, dramatic, and cost-prohibitive increases in the COI amount in October 2016.

   c.    Failing to provide any meaningful advance warning that they intended to massively and suddenly increase the COI amount commencing in September 2016 and/or effective October 2016.

   d.    Ultimately providing a false and misleading explanation to Plaintiffs and the members of the Classes of the grounds for the COI charge increase.

123.    On behalf of the general public and the Classes, Plaintiffs respectfully requests that the Court issue an injunction against Defendants preliminarily and permanently enjoining them (i) from continuing to engage in the unlawful and unfair conduct and preventing Defendants from collecting the unlawfully and unfairly increased COI amounts in violation of the Policies and (ii) ordering any policy to be reinstated that was surrendered or terminated as a result of the COI increase.

124.    On behalf of the general public and the Classes, Plaintiffs further respectfully request that this Court order restitution to be paid by Defendants to the Classes for COI charges, amount of the increased premiums paid, and other amounts wrongfully required, obtained and

collected as the result of the COI increase in violation of the Policies.

125.    Plaintiffs respectfully request an award of attorney fees as the prevailing party in his request for injunctive relief and restitutionary relief against Defendants on behalf of himself and the members of the Classes.

**COUNT VI:  DECLARATORY RELIEF**
**(on behalf of the Nationwide Class and North Carolina Sub-Class)**

126.    Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

127.    An actual controversy has arisen and now exists between Plaintiffs and the members of the Classes, on the one hand, and Defendants, on the other hand, concerning the respective rights and duties of the parties under the Policies.

128.    Defendants contend that they lawfully and appropriately increased the COI amount, have appropriately collected (and is still collecting) COI charges based on the elevated monthly deductions, and that they are permitted to continue to make and collect the monthly deduction in the future for the duration of the Policies. On the other hand, Plaintiffs and the members of the Classes maintain that Defendants have inappropriately and unlawfully, in material breach of the express and implied terms of the Policies, implemented and collected inflated the COI amount.

129.    Plaintiffs, for themselves and on behalf of the Classes, seek a declaration as to the parties' respective rights under the policies and requests the Court to declare that the COI increase is unlawful and in material breach of the policies so that future controversies under the policies may be avoided.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Lincoln New York as follows:

27

(a)     Determining that this action is a proper class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class and Sub-Class defined herein;

(b)     Awarding damages for injury sustained by Plaintiffs and the Class and Sub-Class as a result of Defendants' conduct, together with pre-judgment interest;

(c)     Awarding Plaintiffs, the Class, and the Sub-Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(d)     Awarding Treble damages to the North Carolina Subclass as appropriate;

(e)     Awarding Plaintiffs and the Class and the Sub-Class damages, injunctive relief, and declaratory relief;

(f)     Awarding such other relief as the Court may deem just and proper.

**<u>PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.</u>**

Dated:  February 22, 2017

Respectfully submitted,

_____
Shanon J. Carson, PA ID# 85957
scarson@bm.net
Glen Abramson, PA ID# 78522
gabramson@bm.net
Patrick F. Madden, PA ID# 309991
pmadden@bm.net
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-4656
Fax: (215) 875-4604

**GOLDMAN SCARLATO & PENNY, P.C.**
Brian D. Penny, PA ID# 86805
Paul J. Scarlato, PA ID# 47155
161 Washington Ave, Suite 1025
Conshohocken, PA 19428
Tel.: (484) 342-0700
Fax: (484) 580-8747
penny@lawgsp.com
scarlato@lawgsp.com

*Attorneys for Plaintiffs and the Proposed Class and Subclasses*